Center for Biological Diversity v. United States Forest Service Biological Diversity v. USFS Another way of saying regulatory. I have regulatory authority over all this land that I either own or control. And so those seem very similar. I mean, the word contribute is an active word. I mean, it's a verb. So are you suggesting that land ownership alone could be sufficient? Well, Your Honor, I think the courts have done a good job of kind of... Well, I mean, that kind of calls for a yes or no answer, and then you can maybe explain, but... I think land ownership can be enough, Your Honor. And the courts have done a good job in kind of drawing the line of when landowners are liable versus when they're not. So, for example, the two cases that the defendants, the Forest Service, heavily rely on, the Honeywell case out of the Third Circuit and the Sycamore case out of the Seventh Circuit, in both of those cases, you had defendants who were a property owner or a past property owner, but in both instances, they acquired the property post-contamination. They, in certain instances, had no knowledge of the contamination, and the court rightly ruled that they didn't have the ability to control the disposal in those instances. Similarly, other than Hines, the main case that the district court relied on was the Greenup v. Estate of Richard case out of the Central District of California. In that case, not only defined contributor broadly as those who control the actor who directly causes the pollutants to enter in the system, Forest Service would meet that test, but I think more important, Your Honors, in that opinion, which was the central opinion the district court relied on, the quote, the judge contrasted the facts in Greenup with the facts in this case, which was then on appeal in CBD2. He stated, this case differs from Sender for Biological Diversity because, in that case, the contamination was ongoing, known, and unabated by the landowner. So, we're not asking for every single landowner to be held liable no matter what. I think there's a very reasonable line this court can draw right here with this case, that when you have a landowner that knows that people are coming onto their land, knows they're depositing waste, and the Forest Service has admitted they have the authority to stop it, that's certainly contributing to that disposal. The Forest Service, in fact, they have more authority, more control than a private landowner. If someone's coming onto your private property to dump, you might have to call law enforcement to stop it from happening. The Forest Service has police powers. They have law enforcement powers. If they want to stop this disposal, they can act themselves. Can I ask you a question? How is the use of ammunition, solid waste, under our definition of in ecological rights? Sure thing, Your Honor. So, in ecological rights, the court defined discard, so discarded material, as to cast aside, reject, abandon, or give up. As recently as 2022, in your, the Bakaville case, you stated, you quoted ecological rights, that the test for discarded material, whether a product has served its intended purpose and is no longer wanted by the consumer, is the key consideration in determining whether a substance constitutes solid waste. Under this definition, spent lead ammunition is a solid waste. Once the bullet strikes the target, it's left in the field, in the gut pile. No one's ever argued that the hunters intend to come back for it. No one has ever argued that it's still serving any purpose. No one's ever argued that it's not given up. But isn't your rule too broad? Then it's not the use of it, it's the just, it's leaving it behind. So, even under your theory, wouldn't only RICLA require picking up the used spent bullets? Not the use, because that's intended. If, once you're using it, it's for its intended purpose, correct? So, therefore, it's not solid waste. But, you know, so even under your theory, the use of it shouldn't be banned. Well, Your Honor, the Center has recognized that the Forest Service has an array of potential remedies that it could pursue if the court ordered the service to remedy the endangerment, including a total ban on the use of lead or something short of that, like requiring the hunters to pack out the gut piles or bury them, which is currently voluntarily encouraged. So the Center hasn't requested an outright ban. Oh, okay. And, Your Honors, the interveners heavily quote the ecological rights opinion in their briefing, but they conveniently ignore the section of that opinion where this court cited EPA's guidance on the use of lead ammunition, their best management practices, and EPA, the expert agency tasked with administering RICLA, is quite clear. And their best management practices state, quote, the spent lead ammunition left in the environment is subject to the broader definition of solid waste under RICLA. But it seems to me you have a much easier path once you get past whether they're a contributor, because then you have all of the things that we've been talking about now. But if you don't get past contributor, you don't get to those, correct? That's true, Your Honor. So the question of endangerment isn't before this court currently. That would come out through discovery. But the Center really anticipates no difficulty in establishing the endangerment. It's well established the potential harms from lead in the environment. I'd finally like to just briefly talk about the third prong or the third allegation of the Center's special use permits. So this is active involvement by the Forest Service. Since the outset of this case, the Center has alleged active involvement on the part of the Service. Therefore, the District Court erred when it outright disregarded those facts as irrelevant. The Forest Service issues special use permits, and under the Service's own regulations, those permits must contain terms and conditions necessary to minimize damage to scenic, aesthetic values, fish and wildlife habitat, and otherwise be protective of the environment. It's uncontested that but for these special use permits, the commercial hunting guides could not operate on the Kaibab, and their patrons necessarily couldn't either. So the terms of the permits are directly regulating the terms and conditions under which these parties can hunt on the land. The District Court's analysis here contradicts itself. It first emphasizes the importance of an active role for liability, yet when presented with the ways in which the Service not only has direct regulatory and landowner control, but actually exercises that control, they disregard the facts as irrelevant and insignificant. Therefore, Your Honors, while the Center's allegations regarding the Forest Service's measure of control over disposal of waste is sufficient under Hines, there are additional supporting allegations in the complaint that tie the violation directly to active involvement by the agency. So under both prongs of Hines, I think the Center has met the liberal standard to survive a motion to dismiss here. And I'd like to reserve the rest of my time. Thank you, Counsel. May it please the Court, my name is Alan Brabender. I'm with the Department of Justice, and I'm here on behalf of the federal defendants. The narrow issue before this Court is whether the complaint alleges facts showing that the Forest Service is contributing to the disposal of waste alleged to be spent lead ammunition within the meaning of RCRA. In Hines, this Court rejected an expansive reading of contributor that would sweep in those who merely assist in creating waste, relying instead on the plain meaning of the term contributor, which is to act as a determining factor. And under Hines, a contributor is someone with an active role with a direct connection to waste, specifically by doing that. Or a measure of control. It doesn't combine active with measure in Hines' decision, does it? It absolutely does, Your Honor. First of all, active conduct is required throughout the opinion. The Court is discussing that active conduct is necessary. And then in the syntax of the holding itself, the Hines holds that a measure of control over the waste at the time of disposal is necessary. Or otherwise actively involved. And that or otherwise actively involved language qualifies that the type of control we're talking about is not theoretical control or potential control, but active control. Actively involved control. So in either case, whether we're talking about control or otherwise active involvement with a direct connection to the waste is necessary. And specifically, you have to have done one of the five statutorily required actions. Treat waste, store waste, handle waste, transport waste, or dispose of waste. And the Forest Service is not alleged to have any active function with any direct connection to any of these sorts of actions. The spent lead ammunition enters the environment solely through the choice of individual hunters. The Forest Service is alleged to be passive here, but passivity to someone else's disposal is insufficient, even if that passivity leads or assists in creating the waste. So let's imagine that there was some Forest Service land that abuts some private land, a Hanford-type situation where you had some radioactive waste. And over here, they're trying to get rid of the radioactive waste, and they very cleverly disguise it as either bear cans or garbage cans or whatever. So it moves from this radioactive storage space over to the Forest Service land, and some people go over and they put 25 barrels of this stuff there, and the Forest Service does nothing. Are you saying that the Forest Service would not be a contributor? Exactly. It would not be a contributor because contributor requires active conduct. And in your hypothetical, there's no active conduct on the part of the Forest Service. Now, there's other persons who would be contributors, those who actively moved the substance on the Forest Service lands. Certainly, they would be a contributor. And there are other statutes that may be able to be used to get at that sort of waste that is on the Forest Service lands, but it's not RCRA. Basically, your theory is that a blind eye works in this case, whether you throw over the radioactive barrels or the spent lead lands on Forest Service land. I don't have to do anything if I'm the Forest Service. Is that your position? That is the necessary result of the plain language of RCRA and this Court's holding in Hines. Knowledge or awareness of waste isn't an element of RCRA. RCRA is a strict liability statute. Congress chose to make someone liable not based on knowledge or awareness, but based on being a contributor, someone with an active role with a direct connection to waste. Could the Center have filed a petition for rulemaking? Absolutely, they could. And if the Forest Service had said, we've looked at it and we've decided not to do anything here and didn't call for rulemaking, would that have been reviewable under the APA? Yes, the denial of a petition would be reviewable under the APA, Your Honor. But they have not petitioned, Your Honor, and instead they have chosen to file this RCRA claim. I think their strongest argument is the special use permit. Can you explain why that doesn't give you contributor liability? Well, it's the same argument, in our view, as their unexercised regulatory theory. These special use permits do not in any way regulate hunting, nor do they regulate the disposal of spent lead ammunition. But it allows hunters into the forest property. No, that's not correct. No permit of any kind is necessary to hunt on the National Forest System lands. The guides, I guess, sorry. The commercial hunters. Not even, no. I think commercial hunters is a misnomer. They're not commercial hunters. They're hunters who are being regulated by the State of Arizona, the Arizona Fish and Game Department. Now, the commercial guide is not hunting. They are guiding. Before you sell your services on Forest Service lands, you have to obtain a permit, no matter what the commercial service you're providing. And if you're guiding someone, whether it's hunting, whether it's mushroom picking, whether it's backpacking, whatever the purpose of your guiding is, you have to obtain a permit. But it in no way regulates hunting or the disposal of spent lead ammunition. Now, could the Forest Service somehow through these permits address the issue of lead ammunition? I suppose it could. But that's just another way of saying the Forest Service doesn't exercise regulatory authority in the way that the center would prefer. Do you know the number of special use permits given to guides, hunter guides, I guess? No, the Forest Service doesn't keep track. So any commercial activity, whether it's selling lemonade or being a guide service, requires a special use permit. But that doesn't regulate the customers of that particular service provider. That's correct. Do you think that in order to get a special use permit, could the Forest Service say, you cannot guide hunters using lead ammunition? Yes, I suppose that's something the Forest Service has the authority to do. But again, it hasn't. It's inaction versus contribution. Right, it is inaction. Similarly, attributing landowner status to the Forest Service also doesn't convert unexercised regulatory authority into the required act of conduct. There really is no meaningful distinction, for RCRA purposes, between the Forest Service's status as administrator of the National Forest System and its alleged status as a landowner. The source of the agency's authority is the same, and it should therefore fail for the same reason as their unexercised regulatory authority theory. And even if the Forest Service were a landowner divorced from its regulatory authority, mere land ownership itself is not active involvement, as the Honeywell case discusses that was cited with approval in Hines. No court, and particularly no court post-Hines, has ever found that land ownership alone is sufficient to render someone a contributor. Now this is in contrast with another environmental statute that is similar, which is CERCLA. In CERCLA, Congress chose to make a landowner liable or an owner liable simply because of their status as being an owner. But Congress chose a different route in RCRA. Congress chose to make owners liable, but only to the extent they are contributors or have an active involvement with direct connection to waste. So the fact that Congress chose this different path for RCRA shows that being a landowner in and of itself is not sufficient. And I also say that just being a passive regulatory agency with regulatory control over the subject matter is also insufficient. In the over 40 years since RCRA's passage, not a single court, not one, has ever found a regulatory agency responsible for the disposals of the regulated community. Being a regulatory agency is insufficient because the agency either plays no role, as the case of the Forest Service, or plays too indirect a role to be a legal cause. Allowing a claim against a regulatory agency simply for not exercising regulatory authority would open the floodgates to RIC reliability for agencies at all levels of government. Not only federal government, but the state and local agencies as well. Because some agency could always do more to stop disposals by the regulated community. And Hines rejected an expansive reading of contributor, and it cannot support an even more extreme argument that would effectively eliminate all boundaries to RIC reliability in this context. And with that, I would note that the opening brief, the plaintiff's opening brief, raises a couple of issues with respect to the reassignment of the judge, or with respect to Arizona's 11th Amendment immunity. And the Forest Service has addressed those issues in the brief, and I'd be happy to answer any questions as to those issues, but otherwise we'd rest on the brief. Thank you, counsel. Thank you. Thank you. May it please the court? My name is Norman James. I'm an attorney with Fenimore, Craig, and Phoenix. I'm appearing for the National Shooting Sports Foundation. What I'd like to address is what I consider to be the elephant in the room, and that is whether shooting a rifle at a deer is a disposal of solid waste. And obviously to the interveners in this case, this is a very significant issue, and we think the issue, Your Honors, is properly resolved by the holding of this court in Ecological Rights Foundation. And counsel for the appellants discussed that case briefly, and I don't think gave you an accurate summary of what the holding was. The facts in that case was that utilities were putting wood preservative on their poles. The preservative would leach or otherwise migrate away from the pole. It would be released in the environment. The plaintiffs in that case said that's the disposal of solid waste, and this court said no. And the reason for that, and I'll talk about the basis for it, but the court said that materials that enter the environment as an expected consequence of their intended use do not constitute solid waste. And the reason for that is, again, under RCRA, if you look at the definition of solid waste, it means any garbage, refuse, sludge from a wastewater or water treatment plant, air pollution control facility, and other discarded material. In other words, the material has to be discarded. It's not a question of whether it's no longer wanted by the consumer. The question in ecological rights, and in our case here, is whether the material is entering the environment as an expected consequence of their intended use. And the intended use of ammunition, lead ammunition or any kind of ammunition, you're shooting your rifle at a deer. It strikes the deer. Maybe it strikes a tree. It may go through the deer. It may fragment in the deer. But it's entering the environment as a consequence of its intended use. That's how ammunition is used. So if the United States had shot down the spy balloon over Montana and it landed in Forest Service land, you're saying that wouldn't be at disposal because that was not the intended use of the spy satellite? Well, of the ammo. Of the ammo. Of the ammo. Okay. Yes, exactly, Your Honor. And on that point, and that's a great segue, on that point, the Ninth Circuit in Ecological Rights Foundation, and actually in a prior case, relied on EPA's guidance, EPA's military munitions rule. And again, that was mentioned also by Appellant's counsel. And the Ninth Circuit has said in both, let's see, the other case was, pardon my, Safe Air for Everyone. Safe Air and Ecological Rights both relied on the EPA's military munitions rule. As guidance, and just to, again, to quote from that, it's directly on point here. Yeah, EPA, and this is, I'm reading from page 6630 of the Federal Register, February 12, 1997, Your Honors. In EPA's opinion, the use of munitions does not constitute a waste management activity because munitions are not discarded. Rather, the firing of munitions is within the normal expected use of the product. And it goes on and references the Second Circuit's decision in Connecticut Coastal Council, which I'll talk about in a minute, because that's the exception. That's when ammo can become a solid waste. But it goes on and says, EPA filed a brief as amicus curiae in Connecticut Coastal Council discussing the agency's views on whether lead shot and clay target debris deposited on land and water in the normal course of skeet and trap shooting is solid waste. Under RCRA, in that brief, EPA repeated its position that regulatory jurisdiction does not apply to products that are deposited onto the land in their ordinary manner of use. And going on, EPA- And the guide wanted to kind of bury it for later retrieval so you don't have to cart it in. Would that be disposal if they took this whole box and buried it and then left it? No, not under the hypothetical you've posed, because in that case you're not intending to discard it. If you decided you didn't need it anymore and just threw it in a ravine, yes, that would be disposal. Again, it's whether it's being used for its intended purpose. That's the key. And the example, for example, that EPA gives is it says, today's final action is based on the view that a failure to render safe and retrieve ammunition that lands off the range would be evidence of an intent to discard the munition, just as a failure to respond to a spill of a hazardous material could be evidence of an intent to discard. So, in other words, there needs to be an intent to get rid of the material, to turn it into a solid waste. Now, the appellants attempt to discredit this argument on the basis that the regulatory definition of solid waste promulgated by EPA is narrower than the statutory definition, which is the basis of the citizen-suited claim is on the statutory definition. But the Ninth Circuit has said at least twice now that, and other courts have as well, such as the Puerto Rico District Court case and Waterkeeper, that it still is guidance because under both definitions the key element is discard. Are you discarding the material? If it's not being discarded, if it's being used for its intended purpose, it's not solid waste. Thank you, Counsel. Thank you. Thank you, Your Honors. I'd like to begin by just briefly addressing some of the arguments raised there by interveners. Particularly, they're focusing at the kind of wrong temporal element for when something is discarded. At the moment, it's discharged from the rifle. Sure, it's still at that instant being used for its intended purpose. It's never been the center's allegations that it's the shooting of the rifle that's the disposal, or the discarding. It's always been the leaving of the waste in the environment, which no one's going back for. The Ecological Rights Court noted that the chemicals that had leached from the poles and were sitting at the base of the poles were still serving their intended purpose at that stage because they were preventing the growth of the funguses and the pests from infiltrating the pole. And so, in that sense, they were still being used. But didn't it seep off into the ground, though, in that case? The ground, including immediately surrounding the pole. Right. So it wasn't used to stop the fungus or whatever it was when it was seeping onto the ground. Well, it was still serving that purpose with the immediate vicinity of the poles where the stuff would be growing. But I thought that was our point is that there was no requirement that you have to clean up the seepage onto the ground. It's not the pole issue. Yes, because when it seeped, it was still serving its intended purpose. Here, there's no purpose being served. So the interveners talk about the mill. I don't think that's right. I mean, when it seeped, it was just part of the natural consequence of using the pesticide. It didn't serve any purpose when it was seeped onto the ground. The Ecological Rights Court does refer to it still serving its purpose even after it's leached. And they're quite clear about the meaning. What purpose was that, then? I believe we cited in our brief that whether page 629, whether a product has served its intended purpose and is no longer wanted by the consumer. Oh, excuse me. I don't have the page number in front of me, Your Honor, but it's in the brief. And then the case cites EPA's best management practices for lead ammunition where EPA is quite clear. The interveners refer to the military munitions rule, which is distinct from the best management practices, which is specifically limited to… Is that binding on us in any way? No, but it gives just a good idea. The military munitions rule, it also states that when it's shot off range and not retrieved, it does become solid waste. So that rule is about military shooting ranges. And it says if it lands on range, it's not a waste. But once it goes off range and you don't go pick it up, it's been discarded and it becomes a solid waste. That's what the military munitions rule says, and they just conveniently leave that language out of their briefing. And the Connecticut Coastal case, numerous cases have directly ruled on the fact that lead ammunition, when spent and left in the environment, it becomes discarded and it becomes solid waste. The focus on accumulation in Connecticut Coastal wasn't relevant to whether or not it was a solid waste. It was relevant to whether or not there had been endangerment. That case was a shooting range, and so lead piling up in a pile only causes endangerment once there's a huge quantity and it can seep into the environment and the water. When you have the gut piles that the animals are feeding on, our complaint makes clear that it can be as few as one contaminated gut pile can kill a whole number of birds because they're social animals that feed in groups. And then I'd briefly like to return to Heinz. The Forest Service is overstating the Heinz test. The Heinz test is very clear. It creates two parts, active involvement or a measure of control. It distinguishes control from active involvement. If every instance of control, per se, had to be active, there would be no reason for the court to say it. It would be necessarily subsumed within active involvement because you couldn't have a control unless it's active. Additionally, this court in its previous decision in CBD2, when it remanded it to the district court, it was quite clear that it did not view Heinz as foreclosing this case. It stated the Heinz case doesn't grapple with the fact that when you have a landowner that has known, unabated, and ongoing disposal on their property that they can still be contributing even absent affirmative conduct. Thank you. Thank you, counsel. This case is submitted.
judges: McKEOWN, BYBEE, BUMATAY